Filed 7/23/25  P. v. Murphy CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAQUAN MURPHY et al.,<br><br>    Defendants and Appellants. | B330286<br><br>(Los Angeles County Super. Ct. No. TA152334) |

        APPEALS from judgments of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed.

        The Law Office of J. Blacknell and Kellen I. Davis for Defendant and Appellant Jaquan Murphy.

        Barhoma Law and Matthew Barhoma for Defendant and Appellant Markey Lamont Smith.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Thomas C. Hsieh, and

David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jaquan Murphy and Markey Lamont Smith appeal from the judgments of conviction entered against them following a joint jury trial. The jury found Murphy and Smith guilty with respect to a gang shooting on April 11, 2019 of first degree murder, five counts of attempted murder, and conspiracy to commit murder. The jury also found Murphy guilty of two counts of attempted murder arising from a prior shooting on April 3, 2019.

On appeal, Murphy and Smith contend the trial court abused its discretion in admitting irrelevant and cumulative gang evidence; the prosecutor violated *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by failing to disclose exculpatory information; the accomplice testimony was not supported by sufficient corroborating evidence; and substantial evidence did not support the convictions. Murphy also argues the court erred in admitting Smith's statements to a jailhouse informant and detectives during a *Perkins* operation.[1] Murphy also asserts his trial attorney provided ineffective assistance of counsel by failing to object to Smith's incriminating statements made during the *Perkins* operation; improperly eliciting prejudicial testimony from Murphy when Murphy testified in his own defense; and failing to request a remedy for the *Brady* violation. We affirm.

_____

[1] A police operation in which the police obtain statements made by a defendant to an undercover law enforcement agent or paid informant, typically in a jail cell, is referred to as a "*Perkins* operation." (See *Illinois v. Perkins* (1990) 496 U.S. 292.)

2

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Prosecution's Case*

    1.     *The March 29, 2019 shooting*

On March 29, 2019 Dulce Murphy[2] was driving her car with Smith in the front passenger seat; three of Smith's friends were in the rear seats. When they were near Manchester Park, located at 88th Street and Hoover Street in Los Angeles, a man on a moped shot at Dulce's car from the right side, injuring Smith's right arm. Dulce's face was also bleeding, which she believed was from broken glass. Dulce drove to Centinela hospital, where Smith was treated for his injury. Dulce testified at trial that during the 10-minute drive to the hospital, none of the occupants in the car talked about who had shot at the car or whether there would be retaliation.

Los Angeles Police Officer Brett Kaller testified that he interviewed Dulce and Smith at the hospital on the day of the shooting. Dulce told Officer Kaller that a male dressed in all black shot at her car, cracking the front windshield, and that Smith was the only passenger.[3] Smith said he was seated in the front passenger's seat and, while he was looking down at a text message, he was shot. Officer Kaller testified Smith was uncooperative and did not provide any information about who he believed shot at him. Smith initially said he did not have a phone, although there was a cellphone lying next to him on the

---

[2]     Dulce Murphy and Murphy were married in August 2020 and had three children together. We refer to Dulce Murphy by her first name to avoid confusion.

[3]     At trial Dulce denied she told Officer Kaller that she and Smith were alone in the car.

3

hospital bed. Smith then admitted it was his cellphone but refused to provide his phone number. Instead, Smith provided his mother's phone number. Smith stated he lived in Bellflower but could not recall his home address.

Rayshawn Dale, a Hoover Criminals gang member with the moniker Baby Tre Menace, was a key witness for the prosecution.[4] Dale testified that on March 29 he was "[h]anging out in the shopping center" on Manchester Avenue and Figueroa Street with Smith, who went by the moniker "Chip Seven." Dale and Smith were in the same set (8 Tre) of the Hoovers. Dale left Smith to go to a check-cashing store on Manchester Avenue and Broadway. Dale was at the store when he received a phone call notifying him that Smith had been shot by a man on a minibike. When he walked out of the store, Dale saw two men riding by on minibikes on Manchester Avenue heading eastbound toward Main Street, away from the 110 freeway. About 20 minutes later he saw the two minibikes outside an apartment complex in Main Street Crips territory. Dale then went to Centinela hospital and Dale saw that the car Smith was in "got shot up."[5] Dale took photographs of the car, and he sent them to other Hoovers "[t]o

---

[4] Dale testified while in custody under an immunity agreement with the prosecution, under which he agreed to testify truthfully at trial, pleaded to a lesser charge than murder, and was sentenced to 22 years in prison. On July 10, 2020 Dale, who was serving a sentence for robbery, was transported to a Los Angeles police station for an interview. Dale cooperated with the police after he saw Murphy at the police station and believed Murphy had given information to the police about Dale's involvement in a robbery.

[5] Dale testified the car belonged to a female named Candy. He had not heard the name Dulce before.

4

let them know what had just happened."  The Hoovers blamed the Main Street Crips for the shooting of Smith.

2. *The April 3, 2019 shooting*

On April 3, 2019 Israel Stewart and Deon Outten were attempting to fix Outten's car, which was parked outside an auto parts shop located near the corner of 98th and Main Streets, in Main Street Crips territory.  Outten was in the driver's seat, and Stewart was in the front passenger's seat.  Stewart was looking at his cellphone when he heard Outten say, "Aye, what is you doing?"  Stewart looked up and saw a young black male shooting at them.  Outten was hit once in the arm.  Stewart "tried to hop out the car," and he got hit in the legs and hip by six bullets.  Stewart fell to the ground and tried to crawl to the back of the car.

At approximately 6:22 p.m. Los Angeles Police Sergeant Keleigh Edwards arrived at the scene in response to a radio call.  Sergeant Edwards observed that Outten had an injury to his left forearm and Stewart was on the ground with one or more gunshot wounds to his leg.  An ambulance took Stewart to the hospital, where he stayed for two months and had multiple surgeries.

Dale testified that on the day of the April 3 shooting, he saw some Main Street Crips hanging out near 98th Street and Main Street, one of the Main Street Crips hangouts.  Dale told other Hoovers what he saw; and he, Murphy, and a gang member identified as Shady Tre went in two cars to 98th and Main Street.  Murphy stopped his car in an alley on 98th Street, and Shady Tre "jumped out" of the vehicle, exited the alley, and shot at a man.  Dale, who was in a second car, witnessed the shooting and drove

5

off. About a minute later, Dale returned to the scene and saw a man lying on the ground.

Police obtained surveillance video footage from the auto parts shop and a nearby residence, which showed a white or silver Ford Fusion—with blue tape around the rear window and damage to the front right side—circling the area twice. Los Angeles Police Officer Isaac Fernandez testified the fact the car was circling caught his attention because "[t]ypically that's what rival gang members do as they're looking for a victim to shoot or commit a crime against." Prior to the shooting, the Ford Fusion passed Outten's car and entered an alley just south of the auto parts shop. Then the shooter, wearing a white sweater with black block lettering that said "Nike" on the front, walked through the alley and approached Stewart and Outten, who were seated inside the car. The shooter fired numerous rounds into the car and ran back into the alley. Video footage showed the Ford Fusion quickly exiting the alley after the shooting.

Officer Fernandez conducted a police database search and found that in December 2018 police had stopped a Ford Fusion driven by Murphy near the area of the April 3 shooting. The Ford Fusion was registered to Murphy's brother, Javonn Murphy (Javonn). Officer Fernandez typed the car's license plate into a license plate reader system and saw a March 31, 2019 photograph of a Ford Fusion with its rear window missing and "a plastic covering around it as if it had been involved in some kind of accident or possibly been shot out by someone or vandalized by someone," as well as damage to the front right side. Officer Fernandez determined the Ford Fusion from the March 31 photograph matched the vehicle seen in the surveillance camera footage of the April 3 shooting, based on its collision damage.

Officer Fernandez also viewed Murphy's social media accounts for possible gang ties "as far as motive" for the shooting, which occurred in Main Street Crips territory.  Officer Fernandez explained that "9-8 is one of the sets within Main Street" Crips, named after 98th Street, which is "the epicenter of the 9-8 Main Street Crips" and where they "hang out."  Another Main Street Crips set is "the 1-0-4 set," named for 104th Street, which is "a few blocks south of 98th Street."  Officer Fernandez grew up and worked in the area, and he knew of the "violent feud between . . . the Hoover Criminals and the Main Street Crips."  One photograph from Murphy's social media account showed a silver Ford Fusion with damage to the front ride side of the vehicle.  Another photograph depicted Murphy "wearing that white Nike sweater with black lettering in front," similar to the sweater worn by the shooter.  Murphy made hand signs signifying "9-4 Hoovers" and "A-Trey Hoovers."  A third photograph showed Murphy making a hand sign with another Hoover gang member in the back of the group picture.  In a social media message, Murphy identified himself as "3bankg tha lok," which Officer Fernandez explained meant "Trey Bang," with "3 pronounced trey" and "k" following "n" to signify "Neighborhood killer."  Officer Fernandez added that Hoovers used "tha lok" to mean "loco" or "crazy."  Murphy also posted messages that disparaged the Hoovers' rival gangs, including the Neighborhood Crips and Main Street Crips.

### 3.    *The April 11, 2019 shooting*

Shortly after 6 p.m. on April 11, 2019, Latoya West, Glenn Mitchell, Lautasha Wright, Katherine Love, Dunjae Wynn, Timothy Terry, and Aaron Pleasant were chatting outside a

liquor store on the corner of 103rd and Main Streets. West described the group as standing around talking, with no one making gang signs or doing any "crazy stuff." Terry testified that he, Mitchell, and Pleasant were members of the Main Street Crips.

West saw "a car pull[] up and a girl was hanging out the window hollering." As West was heading inside the liquor store, she got shot in her buttocks and back. Wright, who was seated on a crate in front of the store, heard multiple gunshots. She saw two cars pull up, with gunfire coming from either the backseat or the front passenger seat of one of the cars. As Wright tried to run inside the store, she fell down, and a bullet hit her elbow. Love told Wright that she saw the people in the car and the shooter was in the backseat.[6] Terry was talking to "Gangster Glenn" (Mitchell) when he heard gunshots and got on the ground. Once the car left, Terry got up and saw that Mitchell had been shot. Terry and several other people called 911. Mitchell died from a gunshot wound to his abdomen and had another gunshot wound to his right forearm.

Dale testified that on April 11, the day of rapper Nipsey Hussle's funeral procession, he and another Hoover gang member talked about disrupting the procession because Nipsey Hussle was from a rival gang, the Rollin 60's Crips. Dale and the other gang member decided not to go to the procession because older members of the Hoovers said they should respect the rapper's death. Smith joined them about an hour later, and Dale suggested they go to Main Street (away from the procession).

---

6    Love, who was not injured, refused to testify at trial although she was served with a trial subpoena.

Dale then drove to the area near Main and 103rd Streets, next to the liquor store, and he returned to report that he had seen "a lot of people out" on the street, including "Tiny Red," a Main Street Crip. Smith, Murphy, and two other men then discussed going to the Main Street area, and what guns they should use. Murphy was initially reluctant to participate in the shooting, but he later said, "Fuck it. I'll go." Smith wanted to join the group because a Main Street Crip had shot him. Dale had given his gun to someone else, so the group obtained a gun from another gang member. Dale and Murphy argued over whether to use Dale's or Murphy's car. Murphy initially did not want to use his off-white Ford Fusion because it was "beat up," with damage to the front end. Murphy ultimately agreed to use his car.

Dale testified that Murphy drove off with Smith as a passenger. Dale followed in his car. The two cars took separate paths once they got onto Main Street. Dale drove by the liquor store and told Murphy and Smith by cellphone that there were people gathered in front of the liquor store, but he did not see Tiny Red. Dale's and Murphy's cars passed each other, and Dale made a U-turn to return to the store. When Dale got to 101st Street, he saw Murphy's car slow down in traffic, then Dale heard the gunshots and saw the car drive off. Dale also heard some women screaming, and he saw a man lying on the ground. Dale returned to the Hoovers' hangout on 84th and Hoover Streets. Murphy told Dale that he left his car near his Mother's house because "they had just [done] the shooting." Smith was also at the hangout, "just chillin." Then someone (unidentified) sent a text message to Dale, stating, "They got your car on the camera." Smith told Dale there were "cameras over there," and so Dale and Smith returned to the liquor store in Dale's car to see if that was

9

true.  By that time Main Street was taped off.  Dale did not see any cameras.

Dale returned to the Hoovers' hangout.  An older Main Street Crip member called Murphy's father, Snoop (who Dale said was a Hoover gang member), and asked whether young Hoovers had committed the shooting.  Snoop asked Dale and others whether they had gone over to Main Street Crips territory, and they denied it.  The next day, Dale sent a text message to Smith stating, "And on Hoover, ain't no cams."  Smith responded, "Tops big bro."

Los Angeles Police Detective Iris Romero went to the crime scene and recovered a deformed bullet that had been discharged from a firearm.  She also found bullet holes in the concrete wall of the liquor store.  Seven days later, a Los Angeles Police Department forensic science technician removed two bullets from the wall.  Los Angeles Police Department criminalist Kuang Siu examined the recovered bullets and determined one bullet was "consistent with a[n] ammunition design of a nine-millimeter Luger, .38 special, .38 super auto, and .357 magnum," and a second bullet came from a "nine-millimeter Luger or .38 super auto."  Both bullets could have been fired from a nine-millimeter Luger.

Los Angeles Police Detective Nellie Knight obtained surveillance camera footage from two locations near the liquor store, in addition to video footage from the Hoover territory around 84th Street, northwest of the crime scene.  The video footage showed that at 6:15 p.m. on April 11, the Ford Fusion (with damage to its front right side) travelled to the liquor store.  The Ford Fusion and a second car arrived at the area near the liquor store, then the shooting took place at approximately

10

6:23 p.m.[7]  Video footage from another surveillance camera showed West, Wynn (with an injury to his leg), and Wright at 6:30 p.m., shortly after the shooting.

After reviewing the video footage of the April 3 and 11 shootings, Detective Knight investigated the Ford Fusion and determined that police had made traffic stops of Murphy while he was driving the car in December 2018 and April and May 2019. During the December 9, 2018 traffic stop for a broken front headlight, Murphy told the police officer that he had purchased the vehicle from his brother in November 2018.  Another police officer stopped Murphy when he was driving the Ford Fusion on December 17, 2018.  On April 14, 2019 a third police officer saw the Ford Fusion blocking traffic with the driver's side door open. Murphy then ran up to the driver's side of the car, got in, and parked it on a nearby street.  The officer detained Murphy because the vehicle had an expired registration and was a vehicle of interest.  The officer noticed the vehicle had damage to the front-side fender and a cracked windshield.  Murphy told the officer that he owned the car, and he added that he had been living in the car for the past few days because he had gotten into arguments with his mother.  On April 15, 2019 a police officer stopped Murphy while driving the Ford Fusion and cited him for an expired registration and driving with a suspended license.  On May 17 a police officer saw the Ford Fusion parked at a red curb. Murphy told the officer he got the car from his brother, and he had driven it to the location.  And on May 18 a police officer

---

[7]  Dale identified the Ford Fusion in the surveillance footage as belonging to Murphy.

11

stopped Murphy while Murphy was driving the Ford Fusion for an expired registration.

On May 29, 2019 police officers arrested Murphy for human trafficking and pimping. They recovered four cell phones from the car he was driving, which was a Lexus registered to him. The data extraction report for one of Murphy's phones showed that Smith's cellphone number was saved under the name "C7."

4. *The cellphone location evidence*

Federal Bureau of Investigation (FBI) special agent Michael Easter conducted a historical analysis of Murphy's and Smith's cellphone records. Agent Easter created maps showing where the cellphones were located in relation to the March 29, April 3, and April 11, 2019 incidents based on each cellphone's cell tower usage. Agent Easter explained that a cellphone uses the tower with the best signal, which is predominantly, but not always, the closest tower.

At about 11:30 a.m. on March 29, 2019 Smith's cellphone was active in the area of West 84th Street between Vermont Avenue and Hoover Street. Starting at about 11:49 a.m., Smith's cellphone started to use cell towers further west, using a cell tower in Inglewood at 12:17 p.m. Then at 1:43 p.m. the cellphone started to use cellphone towers near the Centinela hospital and stayed in that area until approximately 1:28 p.m. on the following day.

On April 3, 2019 Murphy's cellphone was active in the area around Manchester Avenue and Broadway between 6:04 and 6:06 p.m. Four minutes later the cellphone showed activity further south, in the area of 108th Street and the 110 freeway. At 6:16 p.m. the cellphone activity was consistent with the

12

cellphone being in the area of the crime scene, around 98th and Main Streets. At 6:26 p.m. Murphy's phone was active in the area of Vermont Avenue and West 88th Street. Between 6:29 and 6:35 p.m., the phone was active in the area around West 92nd and Hoover Streets. Agent Easter testified that Murphy's cellphone activity was consistent with the phone starting a little north of Manchester Avenue, west of the 110 freeway, then moving southward and going to the crime scene at around 6:22 p.m., then returning to the area of Manchester Avenue and Hoover Street.

On April 11, 2019, between 5:59 and 6:15 p.m., both Murphy's and Smith's cellphones were active around West 84th Street between Vermont Avenue and Hoover Street. At 6:15 p.m. Murphy made a call to Dale that lasted over 11 minutes. Around the time of the call, Murphy's car and Dale's car left Hoovers territory. At 6:22 p.m. Murphy's cellphone was active in the area of 107th Street near Main Street (just south of the crime scene). Two minutes later, Murphy's cellphone was active in the area of West 98th Street and Broadway. Between 6:28 and 6:35 p.m., both Murphy's and Smith's cellphones showed activity in the area of Manchester Avenue and the 110 freeway. At 6:35 p.m. Murphy received a call from Dale that lasted 43 seconds.

5. *Smith's statements during the* Perkins *operation*

Smith was arrested on September 15, 2020. The police placed Smith in a jail cell with an undercover *Perkins* agent, who claimed to be a Grape Street Watts gang member.[8] While Smith

---

[8] Detective Knight explained that the *Perkins* agent was not an actual inmate or employed by or associated with any law

and the agent were in the cell, Detective Courtney entered and told Smith the police detectives were coming to talk to him about a drive-by shooting that had happened in April 2019. After the detective left, Smith talked to the *Perkins* agent about the "bullshit" charge, and Smith stated a "[h]omie went to jail" for a robbery with a gun, and "now, this nigga doing some bullshit. Now, the homie's acting to a snitch."[9] Smith later told the *Perkins* agent that the police "said it's a video from the camera, but, on Hoover, it just so, like, [shows] the back and side," but "that shit happened in front of the store." When the *Perkins* agent asked Smith "what type of strap was on y'all," Smith responded, "We had a nine."[10] Smith later told the *Perkins* agent that the "homie" has a lawyer and said "[t]hey ain't got nothing but pictures of niggas," but "[t]hey caught his car on camera."

After the jail cell conversation, Detective Knight and Los Angeles Police Detective David Howell interviewed Smith. Detective Knight advised Smith of his *Miranda* rights[11] before asking him questions about the April 11 shooting. Smith stated that on April 11, 2019 he was at home in Bellflower babysitting

enforcement agency. She did not provide any additional details on the agent other than that he was working undercover. The prosecutor played the audio recording of Smith's jail conversation with the *Perkins* agent to the jury.

[9]     Detective Knight testified that at the time of the *Perkins* operation, only Murphy had been arrested in connection with the murder, and therefore Murphy was the only person that Smith could have been referring to as the "homie" in his conversation with the *Perkins* agent.

[10]     Detective Knight testified "strap" is "a term for firearm."

[11]     *Miranda v. Arizona* (1966) 384 U.S. 436.

14

his 12-year-old niece from the morning until nighttime. During the interview he continued to deny knowing anything about a murder on April 11.

### 6. *Additional gang evidence*

Terry testified he had been a Main Street Crip for 30 years, and he opined "the young people are wild" because "they don't care" and "they do anything." Terry stated the liquor store where the April 11 shooting took place was a Main Street Crips hangout, along with the area of 98th and Main Streets, where the April 3 shooting took place. The Hoover Criminals territory was west of the 110 freeway. At one time the two gangs were allied, and families would have both Main Street Crips and Hoover gang members in the same family. At some point between 1999 and 2004, however, the two gangs became rivals. Smith's attorney asked Terry whether he had been in jail and "heard people in the holding tank brag about things they did on the streets" or "talk about a shooting to try to gain credibility with other inmates." Terry answered "yes" to both questions.

Dale testified about gang monikers and demonstrated some Hoover gang hand signs. The Hoovers' rivals were the Neighborhood Crips, the Main Street Crips, and the Denver Lane Bloods. He stated that until 2008 the Hoover Criminals and Main Street Crips got along, and it was common for a family to have members in both gangs. The two gangs' territories were adjacent to each other, separated by the 110 freeway. If a rival gang disrespected the Hoovers, the Hoovers would retaliate, including by shooting at them. The two gangs would disrespect each other by calling the other gang derogatory names and spray painting the derogatory names in the other gang's territory. Dale

15

and other Hoover Criminals had committed burglaries, robberies, assaults, and other violent crimes. Dale testified Smith had a "C7" tattoo on his chest. Smith's brother, called "Pack Rat," was a Main Street Crip who had been killed.

Dulce, who was called as a prosecution witness, testified she had never heard of the Main Street Crips or Hoover Criminals. She had never heard anyone call Smith or Murphy by a nickname, and she had never seen either flash gang hand signs. Dulce testified Murphy was "very humble, respectful, generous, and loving." Dulce also stated Murphy had "never been aggressive" or violent. Dulce denied Murphy was a Hoover gang member, stating she had "never seen him" do "any gang-related stuff." When the prosecutor showed Dulce photographs from Murphy's social media account depicting Murphy making hand gestures, Dulce testified she had never seen Murphy make those hand gestures and did not know what they meant or that they were gang hand signs. With respect to a photograph of Murphy holding a gun, Dulce stated it could be a BB gun, a water gun, or an actual gun. She had never seen Murphy holding a gun, and he did not have access to a gun. When asked whether the social media photographs changed her opinion that Murphy was not violent, Dulce responded, "He is not violent. No, he's not."

B.    *Murphy's Case*

Murphy, Murphy's older brother, Javonn, and Murphy's father, Javonnie Murphy (Javonnie), testified on Murphy's behalf. Murphy testified he was not involved in the April 3 or 11 shooting. He acknowledged he was a current Hoover gang member with the moniker "Baby Tre Bang." Javonn first gave Murphy "custody, control, or possession" of the Ford Fusion in

16

2018.  Other people in the community also drove the car because Javonn would leave the key in the car.  Murphy denied driving the car on April 3 or April 11, 2019.  He did not know that the Ford Fusion was involved in a crime until his arrest on July 9, 2020.

Javonn testified the gray 2007 Ford Fusion was registered to him, and he had purchased the car sometime between 2010 and 2015.  In April 2019 Javonn parked the car on 84th Street between Hoover Street and Vermont Avenue.  He did not live there, but he had a lot of family in the area.  He knew Murphy drove the car, but he did not authorize anyone else to drive it.  There was only one key to the car, which Javonn kept, but he sometimes left the key in the car.  Javonn received several tickets for other people who drove the Ford Fusion; he did not know them.  On one occasion, Javonn was at a gas station on Hoover Street and Manchester Avenue when he saw a person he did not know drive the Ford Fusion with two strangers as passengers.  Javonn was not affiliated with any gang; however, he knew members of his family were involved in a gang.

Javonnie testified he was a former Hoover gang member, but he stopped being affiliated with the gang 20 years ago, after he was shot.  Javonnie did not like the fact that Murphy joined the Hoovers.  Javonnie knew Murphy used the name "Tre Bang," but there were "multiple Tre Bangs."  Javonnie was aware that Javonn owned the Ford Fusion, and Javonnie had seen Murphy drive the car.  Javonnie also saw multiple people, including Dale, drive the car.  It was common for a gang member to use another gang member's car, sometimes without asking.  On April 11, 2019 Javonnie's uncle picked him up on 84th Street, and they went to Lancaster around 12:00 or 1:00 p.m. and stayed until around

17

8:00 p.m.  Javonnie did not see or talk with Dale, Murphy, or any Hoover gang members that day.  Javonnie also denied that he received a phone call from a person associated with the Main Street Crips on April 11.  He likewise denied that he had any friends or associated with anyone from the Main Street Crips, other than Smith's brother, who had died.

C.    *Smith's Case*

Misha Smith (Misha), Smith's oldest sister, testified on his behalf.  In March 2019 Misha lived with Smith and their mother in Bellflower.  Misha visited Smith at the hospital when he was shot.  She saw that the black Impala that Smith had been in had bullet holes on the right front passenger side of the car.  Smith had a cast on his right arm, which was removed two weeks later.  Misha explained Smith had tattoos on his face and body because "he like[d] being an artist," specifically, a rap artist.  Misha did not know Smith to be a gang member, and she had never seen him with a gun.  She also denied hearing anyone refer to Smith as "Chip."  The family called Smith "Chucky," a name their grandfather gave him.

D.    *The Verdicts and Sentencing*

The jury found Murphy guilty with respect to the April 3 shooting of two counts of attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664; counts 1 & 2).  The jury further found Murphy and Smith guilty with respect to the April 11 shooting of willful, deliberate, and premeditated murder of Mitchell (§§ 187, subd. (a), 664; count 3), five counts of attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664; counts 4-8), and conspiracy to commit murder

18

(§ 182, subd. (a)(1); count 9). The jury also found Smith guilty of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 11). The jury found true with respect to count 2 for Murphy and counts 3 through 8 for both defendants that a principal was armed with a firearm (§ 12022, subd. (a)(1)), but it found not true the personal-use firearm allegations (§ 12022.53, subds. (b)-(d)). In a bifurcated court proceeding, Murphy (with respect to counts 1 through 9) and Smith (with respect to counts 3 through 9) admitted the gang allegations (§ 186.22, subd. (b)), the allegations that a principal personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)), and the allegations that for each count Murphy and Smith had a prior serious or violent felony conviction under the three strikes law (§§ 667, subds. (b)-(j), 1170.12). Murphy and Smith also admitted the alleged aggravating factors with respect to all counts.

The trial court sentenced Murphy to an aggregate state prison term of 100 years to life plus two life sentences, each with a 15-year minimum parole eligibility term. The court sentenced Smith to an aggregate state prison term of 75 years to life plus one life sentence with a 15-year minimum parole eligibility term, plus eight months.[12] Murphy and Smith timely appealed.

---

[12] The trial court sentenced Murphy on count 1 for attempted murder to a life sentence with a 15-year minimum parole eligibility term based on the gang allegation (§ 186.22, subd. (b)(1)(C)(5)), plus 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1). The court imposed the same sentence on count 2 for attempted murder (a life sentence with a 15-year minimum parole eligibility term) but ran the sentence concurrent to count 1 and stayed the

19

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Admitting the Gang Evidence*

1. *The trial court proceeding*

At a pretrial hearing, Murphy and Smith moved to exclude or limit the prosecution's gang evidence. The prosecutor made an offer of proof that he intended to present evidence that the defendants were members of the Hoover gang, that the shootings took place in territory controlled by the Main Street Crips, and that animus between the gangs resulted in "shootings back and forth." The prosecutor argued the evidence was essential to show the motive for the shootings on April 3 and 11 was to retaliate for the shooting of Smith by the rival Main Street Crips on March 29 and to provide context for testimony about the

---

firearm enhancements. On count 3 for first degree murder the court sentenced Murphy and Smith to 25 years to life, plus 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1). On count 5 for attempted murder, the court sentenced Murphy and Smith to a life sentence with a 15-year minimum parole eligibility term, plus 25 years to life, to run consecutive to the other terms (same as count 1). The court imposed the same life sentence with a 15-year minimum parole eligibility term on counts 4, 6, 7, and 8 as to Murphy and Smith, to run concurrent to the sentence on count 5, but stayed the firearm enhancements. On count 9 for conspiracy, the court sentenced the defendants to concurrent terms of 25 years to life. On count 11 for possession of a firearm by Smith, the court sentenced him to a consecutive term of eight months (one third of the middle term). (There was no count 10 alleged against Murphy or Smith.) The court struck the alleged strikes and stayed all remaining enhancements.

shootings. In addition, the gang evidence was necessary to explain why Dale (as a Hoover gang member) knew what had happened during the shootings and why Murphy and Smith would have shared information with Dale about the shootings. The prosecutor noted that he did not intend to introduce any evidence about the primary activities of the gang, predicate offenses, or other requirements to prove a gang enhancement.

Smith's attorney argued the trial court had granted the defendants' motion to bifurcate trial on the gang enhancement allegations, and evidence of the defendants' gang membership and gang rivalry was not necessary to prove the charges; rather, the prosecution should focus on evidence of the defendants' involvement in the shootings. Murphy's attorney asserted that the prejudice from the gang evidence would far outweigh the probative value and confuse the jury as to what the case was about.

The trial court denied the defendants' motion to exclude the gang evidence. The court reasoned the April 3 and 11 shootings were alleged to be in retaliation for the March 29 shooting committed by the Main Street Crips. Further, the jury instructions stated the jury may consider motive in determining whether a defendant committed a crime. Thus, "a limited amount of gang testimony is admissible for the People to prove that there was a motive in the case." In addition, the planning of the murder as retaliation for the March 29 shooting was relevant to prove the overt acts for the conspiracy charge. The court added that the prosecution's key witness (Dale) was himself a gang member, and the prosecution would rely on him instead of a gang expert to describe the gang rivalry and motive for the shootings.

2. *Governing law and standard of review*

"In 2021, the Legislature passed Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333), known as the STEP Forward Act of 2021. (Stats. 2021, ch. 699, § 1.) Assembly Bill 333 amended Penal Code section 186.22 by imposing new substantive requirements relating to gang enhancements and the criminal offense of gang participation." (*People v. Burgos* (2024) 16 Cal.5th 1, 7, fn. omitted.) Assembly Bill 333 also added section 1109, which provides that a trial court must try a gang enhancement charge separately from the underlying offense, upon the request of the defense. (*Burgos*, at p. 7; § 1109, subd. (a); Stats. 2021, ch. 699, § 5.) "[S]ection 1109 does not disturb existing case law holding that gang evidence may be admitted to prove substantive crimes." (*People v. Garcia* (2024) 107 Cal.App.5th 1040, 1049; accord, *People v. Hinojos* (2025) 110 Cal.App.5th 524, 549.)

We recognize, as defendants point out, that in enacting Assembly Bill 333 and requiring bifurcation of trial on the gang enhancement under section 1109, the Legislature found that gang evidence "'can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people.'" (*People v. Burgos, supra*, 16 Cal.5th at p. 10.) However, "[t]he People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31; accord, *Burgos*, at p. 23 ["in some instances, the same gang evidence introduced to establish the elements of a gang enhancement might be admissible at a bifurcated trial on the underlying charge"].)

As the Supreme Court explained in *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772, "Although evidence of gang membership carries the potential for prejudice, it "'is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime."'" (Accord, *People v. Ramirez* (2022) 13 Cal.5th 997, 1095 [gang evidence "is admissible even when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect"].)

We review a trial court's ruling on the admissibility of gang evidence for an abuse of discretion. (*People v. Ramirez, supra*, 13 Cal.5th at p. 1095; see *People v. Chhoun, supra*, 11 Cal.5th at p. 33 ["""The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.""'].)

3. *The probative value of the gang evidence was greater than any prejudice*

Murphy and Smith contend the trial court abused its discretion in admitting excessive gang-related evidence, including Dale's testimony about his own involvement with the Hoover gang, the gang's hand signs, gang monikers, and rival gangs; Murphy's social media account showing him making hand signs and using offensive language; cross-examination of Murphy and Javonnie about the "lifestyle" and "mindset" of Hoover gang

23

members; questioning of Murphy as to whether "gang members need to retaliate" to avoid being weak; questioning of Dulce about the Hoovers and Main Street Crips and whether she had seen Murphy or Smith make gang hand signs; cross-examination of Misha about Smith's "C7" tattoo and whether the "C" referred to Hoover gang members called "Chip"; and testimony from Los Angeles Police Officer Jahaziel Andrade that he conducted a traffic stop of Murphy in the Ford Fusion based on the fact the car had been previously involved in "gang crimes." Smith also argues the prosecutor improperly focused on gang evidence during his opening statement, and the focus on gangs in the opening statement and testimony "made the case about nothing other than guilt-by-gang-membership." The court did not abuse its discretion.

Officer Fernandez's testimony about Murphy's social media posts showing him making Hoover gang hand signs, his description of the Hoover and Main Street Crip gang sets, the historic rivalry between the two gangs, the gangs' territories, and the retaliatory shootings the two gangs had committed against each other were highly relevant to prove Murphy's and Smith's motives, intent to kill, and involvement in the April 3 and April 11 shootings.[13] (See *People v. Holmes, McClain and Newborn, supra*, 12 Cal.5th at p. 772 ["Given the circumstances of the shootings, which were clearly intended as gang retaliation, defendants' membership was highly relevant to prove their involvement, motive, and intent to kill. The prosecution had a

---

[13] Officer Andrade's testimony that he stopped the Ford Fusion that Murphy was driving (with front-end damage) because of a suspicion it had been involved in "gang crimes" was relevant to Murphy's involvement in the two shootings.

24

right to present the evidence."]; *People v. Duong* (2020) 10 Cal.5th 36, 64 [gang evidence was admissible to prove motive because it "explained defendant's willingness to shoot a complete stranger minutes after a verbal spat, along with the apparent coordination among defendant's associates to destroy the surveillance tape"]; *People v. Huynh* (2021) 65 Cal.App.5th 969, 980-981 ["gang motives include 'criminal activity against a rival'" and "'retaliation for a prior attack upon a gang member'"].)

Likewise, Dale's testimony about his and defendants' membership in the Hoover gang, the Hoovers' rivalry with the Main Street Crips, and related testimony about the gangs was highly probative of defendants' motive and intent to kill. Although Officer Fernandez provided similar testimony, Dale's testimony was relevant because it showed he was knowledgeable about the gangs and could provide credible testimony about the March and April shootings. Similarly, the photographs of Dale making gang signs with Murphy and Smith was relevant to his credibility in describing the events of March 29, April 3, and April 11 and the involvement of Murphy and Smith in those events.[14] The prosecutor's cross-examination of Murphy about

_____

[14] Murphy also argues the prosecutor's reference during his examination of Dale to Murphy and Smith as "Chip" and "Tre Bang" was improper and prejudicial. Dale testified that he knew Murphy and Smith by their gang monikers, and it would be easier for him to testify about them in this manner. The prosecutor then continued his questioning of Dale by asking about the actions of Chip and Tre Bang. Neither Murphy or Smith objected to the prosecutor's use of their gang monikers in his questioning of Dale, thereby forfeiting the contention the trial court abused its discretion in allowing this form of questioning.

25

his current Hoover gang affiliation and gang culture was similarly relevant to his motive for the shootings.

The trial court also did not abuse its discretion in allowing the prosecutor to question Javonnie about his gang membership in light of Javonnie's testimony on direct examination he had retired from the Hoover gang 20 years earlier. As discussed, Dale testified Javonnie was a current Hoover gang member, and an older Main Street Crip gang member had called Javonnie to inquire about the April 11 shooting. The prosecutor's questioning of Dulce about Murphy's and Smith's gang membership (which she denied) and photographs of Murphy making gang hand signs was relevant to Dulce's credibility given her testimony that Murphy had "never been aggressive" or violent, and Murphy did not have "it in him" to shoot someone. The questioning of Misha about Smith's tattoos and gang membership was likewise proper impeachment given her testimony that Smith's "C7" tattoo was only for artistic purposes. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168 ["Gang evidence is . . . relevant on the issue of a witness's credibility."]; *In re Ross* (1995) 10 Cal.4th 184, 207 ["'Once appellant placed his general character in issue, the prosecutor was entitled to rebut with evidence or argument suggesting a more balanced picture of his personality.'"].)

---

(*People v. Pineda* (2022) 13 Cal.5th 186, 237-238 [defendant forfeited contention cross-examination about gang membership was improper given failure to timely object].) The Attorney General asserts forfeiture as to several other arguments made by defendants regarding admission of gang evidence, but most of the testimony at issue was the subject of defendants' motions in limine.

Finally, Murphy and Smith contend the trial court abused its discretion in finding the probative value of the gang evidence outweighed its prejudicial effect.  Under Evidence Code section 352, "a trial court, 'in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  We review a trial court's decision to admit evidence under Evidence Code section 352 for abuse of discretion, and 'do not disturb the trial court's ruling unless it was arbitrary, capricious, or made in a '"patently absurd manner that resulted in a manifest miscarriage of justice."'"" (*People v. Lamb* (2024) 16 Cal.5th 400, 424; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 358.) "Prejudice under Evidence Code section 352 refers to ""evidence which uniquely tends to evoke an emotional bias against [the] defendant as an individual and which has very little effect on the issues.'" [Citation.]  In this context, """prejudicial" is not synonymous with "damaging."'" [Citation.]  "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant.  The code speaks in terms of *undue* prejudice.  Unless the dangers of undue prejudice, confusion, or time consumption '"substantially outweigh"' the probative value of relevant evidence, a section 352 objection should fail."'" (*Thomas*, at p. 363; accord, *Lamb*, at p. 425.)

The trial court did not abuse its discretion in finding the probative value of the gang evidence—to prove motive and intent to kill and to assess witness credibility—exceeded its prejudicial

27

effect.  (*People v. Chhoun, supra*, 11 Cal.5th at p. 32 [""'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.'"'"]; *People v. Duong, supra*, 10 Cal.5th at p. 65 [probative value of gang evidence "was not substantially outweighed by the probability of undue prejudice"].)  Moreover, the court properly instructed the jury with CALCRIM No. 1403 that the jury could only consider gang evidence for limited purposes, including motive, "the relationship between the parties involved," and the credibility of a witness, and not as evidence that "a defendant is a person of bad character or that he has a disposition to commit crime."

B.      *Murphy Has Not Established Ineffective Assistance of Counsel Based on His Attorney's Direct Examination*

To prevail on a claim of ineffective assistance of counsel, a defendant bears the burden to show (1) his or her ""'counsel's representation fell below an objective standard of reasonableness under prevailing professional norms'"'" and (2) he or she ""'suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.'"'" (*People v. Johnson* (2016) 62 Cal.4th 600, 653; accord, *People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*); *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.)

Moreover, "[o]n direct appeal, if the record "'sheds no light on why counsel acted or failed to act in the manner challenged,'" we must reject the claim "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'"'" (*People v. Caro* (2019)

7 Cal.5th 463, 488; accord, *Mickel, supra*, 2 Cal.5th at p. 198 ["a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission"]; *People v. Lopez* (2008) 42 Cal.4th 960, 972 ["except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal"].)  We presume "that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.'"  (*Mickel*, at p. 198; accord, *People v. Bell* (2019) 7 Cal.5th 70, 125 ["'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."'"].)

Murphy contends his trial attorney rendered ineffective assistance of counsel by eliciting prejudicial testimony from Murphy when he testified in his own defense.  Murphy argues his attorney inexplicably elicited from him that he was in custody at the time of trial and had been in custody for two-and-a-half years.  But Murphy later testified that "being in jail for the two years" led him to change his mindset about being in a gang (to be more negative) because during the time he was in custody he observed family and friends who he thought loved him "just changed on" him.  His attorney could have had a tactical reason for eliciting this evidence to cast Murphy in a more favorable light by showing he no longer wanted to be involved with the Hoovers.

29

Murphy also asserts his attorney was ineffective in eliciting that Murphy spent time in a juvenile hall camp. But Murphy's attorney did not ask Murphy about his time in juvenile hall. Rather, he simply asked Murphy whether he had any education after he graduated from high school. Murphy answered that he had studied criminal justice in college for a month. Murphy then added, without prompting, that he had taken criminal justice classes while he was in a juvenile hall camp.

Murphy also criticizes his trial attorney for eliciting testimony about his being stopped by the police for pimping and pandering. His attorney asked whether Murphy was aware that a police officer had implicated him in a pimping and pandering allegation. Murphy responded that he was aware of the allegations and still faced the charges. He explained that a police officer stopped him and pulled him out of the car, stating that he was under investigation for prostitution and pimping. Murphy denied that he was a pimp and explained the passenger in his car was his little cousin, and he gave her rides in exchange for gas money.

Murphy's attorney had a tactical reason to ask Murphy about the pimping allegation to give Murphy an opportunity to refute the allegation that he was a pimp and involved in prostitution, which came out during testimony from Los Angeles Police Officer Jose Zavala. Officer Zavala had testified during the prosecution's case that he stopped Murphy on May 29, 2019 and arrested him for pimping and prostitution, at which time the officer obtained from Murphy's vehicle four cellphones, including one from Murphy that was used for the investigation into where his cellphone was at the time of the shootings. Officer Zavala explained he arrested Murphy on May 29 because Murphy had

dropped off his female passenger in a high prostitution area, and he and the female in his car had condoms in the car that were from packaging with the same serial number.

Murphy's trial attorney may have also had a tactical reason for eliciting testimony from Murphy about his being arrested for the robbery and murder of the rapper Pop Smoke. Detective Knight's recorded interview of Dale was played for the jury during the prosecution's case. In the interview, Dale implicated Murphy in the murder of Pop Smoke. Murphy's attorney asked Murphy whether he heard in the taped interview that Dale had implicated him in the Pop Smoke murder. Murphy answered, "I believe Detective Knight told [Dale] that I was also being arrested for the Pop Smoke. I think he just asked her, like, oh, oh, is [Murphy] down for that I think she brought that up to him." Murphy's attorney then asked, "[Y]ou weren't involved in that incident, is that correct?" Murphy replied, "No, sir, I wasn't charged in the incident." This was consistent with Detective Knight's testimony at trial that at the end of the investigation, Murphy had not been charged with the Pop Smoke murder. Murphy's attorney therefore had a tactical reason to ask Murphy about his arrest for the Pop Smoke murder so that Murphy could deny any involvement and cast doubt on Dale's credibility.

Finally, Murphy contends his attorney was ineffective by eliciting testimony that Murphy had "custody, control, or possession of the Ford Fusion." Murphy's attorney had a tactical reason to have Murphy acknowledge that he drove the Ford Fusion. Prior to Murphy's testimony, the prosecutor had presented testimony from five police officers who had stopped Murphy while he drove the Ford Fusion. Murphy's admission that he drove the Ford Fusion bolstered his credibility. The jury

31

was therefore more likely to believe Murphy's additional testimony that other individuals in the community drove the Ford Fusion and that Murphy did not drive the car on April 3 or April 11, 2019.

C.    *Murphy and Smith Forfeited Their* Brady *Challenge, and Murphy's Trial Attorney Did Not Render Ineffective Assistance of Counsel*

"""In *Brady* [*v. Maryland* (1963) 373 U.S. 83], the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' [Citation.] The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. Such evidence is material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" [Citation.] In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'"""" (*People v. Masters* (2016) 62 Cal.4th 1019, 1066-1067; accord, *In re Masters* (2019) 7 Cal.5th 1054, 1086-1087.) "Evidence actually presented at trial is not considered suppressed for *Brady* purposes, even if that evidence had not been previously

32

disclosed during discovery." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 467.)

"For a defendant to obtain relief under *Brady*, ""[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' [Citation.] Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result."'"" (*People v. Masters, supra*, 62 Cal.4th at p. 1067; accord, *In re Masters, supra*, 7 Cal.5th at p. 1087.) We independently review whether there has been a *Brady* violation, giving '"great weight to any trial court findings of fact that are supported by substantial evidence."' (*People v. Masters*, at p. 1067; accord, *In re Masters*, at p. 1087.)

During trial Detective Knight testified that only Murphy had been stopped by the police for driving the Ford Fusion. In cross-examination, Detective Knight acknowledged, after having her recollection refreshed, that at the preliminary hearing she was asked whether Travelle Mitchell (whom she described as a gang member associated with Murphy) had ever been stopped in the Ford Fusion and given a traffic citation. Detective Knight stated at trial with respect to that question, "I responded with

33

yes when my real answer was, I guess, no." She added that section 7 of her evidence book for the case (the "murder book") listed the traffic stops that had been made on the Ford Fusion and did not reflect that Travelle Mitchell had been stopped. But at the preliminary hearing Detective Knight had referred to a "database" identifying Travelle Mitchell. Detective Knight also stated in response to another question that she had no evidence that a person named Devonte Richardson drove the vehicle. However, she explained, "In reviewing all of the evidence that I have recovered throughout my two-and-a-half-year investigation, the only person that was brought to my knowledge in reviewing social media account[s] that drove the car is . . . Zaihid Richardson." Detective Knight denied this was the same person as Devonte Richardson.

Smith contends the prosecutor committed a *Brady* violation by failing to disclose to defense counsel the database that Detective Knight referenced in her preliminary hearing testimony showing that Travelle Mitchell had driven the Ford Fusion. Smith also argues the prosecution was required to turn over the social media records relating to Zaihid Richardson. Murphy argues the prosecution was required to disclose the database of all individuals who had driven the Ford Fusion around the time of the shootings, as well as documentation of Murphy's five traffic stops in the vehicle. However, Murphy and Smith forfeited their *Brady* arguments by failing to raise them in the trial court. (*People v. Williams* (2015) 61 Cal.4th 1244, 1284 [defendants forfeited claim "the prosecution withheld impeachment evidence" in violation of *Brady* "because it was not made below"]; *People v. Morrison* (2004) 34 Cal.4th 698, 714 [*Brady* claim forfeited where defendant failed to object or request

34

appropriate sanctions]; see *People v. Romero* (2008) 44 Cal.4th 386, 411 [forfeiture ""applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights""].)[15]

Murphy also contends his trial attorney rendered ineffective assistance of counsel because he failed to make a motion to obtain evidence that other individuals drove the Ford Fusion or to request a remedy for the *Brady* violation. Murphy argues this was a critical piece of evidence because there was no direct evidence of the identity of the driver or shooter, and the only circumstantial evidence that Murphy was a perpetrator was that he had access to the vehicle.

Murphy has not met his burden to show ineffective assistance of counsel. (*Strickland v. Washington, supra*, 466 U.S. at pp. 687-692; *Mickel, supra*, 2 Cal.5th at p. 198; *People v. Johnson, supra*, 62 Cal.4th at p. 653.) The record does not reflect why Murphy's trial attorney elected not to raise a *Brady* violation at trial, especially given Detective Knight's testimony at the preliminary hearing about the database. Murphy's attorney could have had tactical reasons for not requesting discovery about whether other individuals drove the Ford Fusion. Murphy's attorney was able to impeach Detective Knight with her preliminary hearing testimony in which she stated a database showed Travelle Mitchell had driven the Ford Fusion. In addition, although Detective Knight initially denied at trial

---

[15]    The Attorney General argues Murphy and Smith failed to show prejudice because they did not point to any evidence that there were other drivers of the vehicle. We do not reach the merits because we find forfeiture and no ineffective assistance of counsel.

that anyone other than Murphy had driven the vehicle, Murphy's attorney was able to cast doubt on the prosecutor's theory that Murphy was the only driver by eliciting from Detective Knight that social media accounts showed Zaihid Richardson had driven the Ford Fusion.  Murphy's attorney may have known from Murphy or his brother Javonn (the car owner) that there were no other drivers, so it was better tactically to use the preliminary hearing testimony for impeachment purposes without focusing on the database prior to trial.

D.     *The* Aranda-Bruton *Rule Does Not Bar Smith's Statements to the* Perkins *Agent or the Detectives*

Murphy contends the admission of Smith's unredacted statements made to the undercover *Perkins* agent and to detectives violated his Sixth Amendment confrontation clause rights under the *Aranda-Bruton* doctrine.  (*Bruton v. United States* (1968) 391 U.S. 123; *People v. Aranda* (1965) 63 Cal.2d 518.)  "The *Aranda-Bruton* doctrine 'addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant,' and prevents such a statement's admission even if a limiting instruction is given to the jury." (*People v. Tran* (2022) 13 Cal.5th 1169, 1194; accord, *People v. Capistrano* (2014) 59 Cal.4th 830, 869, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

"[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  (*Richardson v. Marsh* (1987) 481 U.S. 200, 211;

36

accord, *People v. Lewis* (2008) 43 Cal.4th 415, 454, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919.) However, "[w]hen, despite redaction, the statement 'obviously refer[s] directly to someone, often obviously the defendant, and . . . *involve[s] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial*' [citation] the *Bruton* rule applie[s] and introduction of the statement at a joint trial violate[s] the defendant's rights under the confrontation clause." (*Lewis*, at p. 455, quoting *Gray v. Maryland* (1998) 523 U.S. 185, 196-197.)

The California Supreme Court in *People v. Tran, supra*, 13 Cal.5th at page 1195 explained that *Crawford v. Washington* (2004) 541 U.S. 36 "narrowed confrontation clause rights under the *Aranda-Bruton* doctrine to testimonial statements only." (Accord, *People v. Cortez* (2016) 63 Cal.4th 101, 129 ["'the confrontation clause applies *only to testimonial hearsay statements* and not to [hearsay] statements that are nontestimonial'"].) "'Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" (*People v. Sanchez* (2016) 63 Cal.4th 665, 688; accord, *People v. Fayed* (2020) 9 Cal.5th 147, 168 ["a declarant's hearsay statement is testimonial if made 'with a primary purpose of creating an out-of-court substitute for trial testimony'"].)

37

Murphy contends the trial court violated his rights under Sixth Amendment's confrontation clause pursuant to *Aranda-Bruton* by admitting in the joint trial Smith's unredacted statements made to the undercover *Perkins* agent. But Smith's statements to the agent were nontestimonial because the agent was not employed by law enforcement, and there is no indication Smith was aware the agent was not a fellow inmate. (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1214 [stating with respect to letters exchanged between codefendants while in jail, "[p]rivate communications between inmates are not testimonial, and their admission would not violate the principle laid down in *Crawford* that bars the use at trial of testimonial out-of-court statements as to which no opportunity for cross-examination was afforded"], overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Almeda* (2018) 19 Cal.App.5th 346, 362-363 ["'[S]tatements made unwittingly to a Government informant' and 'statements from one prisoner to another' are nontestimonial statements."], quoting *Davis v. Washington* (2006) 547 U.S. 813, 825; *People v. Gallardo* (2017) 18 Cal.App.5th 51, 67-68 [codefendant's jailhouse statements to two paid informants posing as inmates were nontestimonial where "there [was] no evidence indicating [codefendant] knew he was speaking to police informants, or otherwise anticipated his statements would '"be used prosecutorially"'"].)

Because Smith's statements to the *Perkins* agent were not testimonial, *Aranda-Bruton* does not apply. (*People v. Almeda, supra,* 19 Cal.App.5th at p. 362 ["*Bruton* is no longer applicable to a non-testimonial "prison yard conversation" because "*Bruton* is no more than a by-product of the Confrontation Clause"'"]; *People v. Washington* (2017) 15 Cal.App.5th 19, 29 [same].)

Murphy also contends his confrontation rights under *Aranda-Bruton* were violated by admission of Smith's statements to the detectives during his police interview in connection with the *Perkins* operation. Specifically, Murphy argues, without any citation to the record, that Smith implicated him in the April 11 shooting because Smith referenced a "driver" in his statement to detectives. Murphy asserts that even though Smith did not identify him by name, Smith's statement "compromised" him because the prosecution's theory was that Murphy was the driver. We have reviewed the transcript of Smith's police interview, and we see no reference during the interview to the driver of the Ford Fusion. Moreover, Smith made no incriminating statements about himself or Murphy during the police interview. Detective Knight showed Smith three photographs of the Ford Fusion, and Smith consistently denied ever seeing the vehicle or being in it. Detective Knight said to Smith as to the April 11 shooting, there had to be "a person that's driving" and "a person that's a shooter." Smith responded, "I guess. I don't know. I'm not into that." Smith repeatedly denied any involvement in the April 11 shooting. Because Smith's statements to the detectives did not "facially incriminat[e]" Murphy, there was no violation of the *Aranda-Bruton* rule. (*Richardson v. Marsh, supra*, 481 U.S. at pp. 207-208; *People v. Fletcher* (1996) 13 Cal.4th 451, 455; see *People v. Ramirez, supra*, 13 Cal.5th at p. 1149 [*Aranda-Bruton* rule inapplicable where "[t]here was no joint trial and [codefendant's] statements were not facially incriminating of defendant"].)

Murphy makes the additional argument that Smith's denial during the police interview of any involvement in a gang or the April 11 shooting, combined with Murphy's similar denials,

39

"lent to the inference that Murphy and Smith coordinated a plan to deny everything if and when they were apprehended." But "[t]he class of inferentially incriminating statements under *Bruton* is limited to 'obvious[]' ones, 'inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial.'" (*People v. Montes* (2014) 58 Cal.4th 809, 867; accord, *People v. Gallardo, supra*, 18 Cal.App.5th at p. 80 [defendant's statements regarding his driving a specific car "did not 'facially incriminate' [codefendants] nor did the statements create an 'obvious inference' that those codefendants participated in the shooting"].) Here, Smith's denial of any involvement in the April 11 shooting did not create an obvious inference that Murphy participated in the shooting.

E.    *The Accomplice Testimony Was Sufficiently Corroborated by Other Evidence*

"Penal Code section 1111 provides that an accomplice's testimony cannot support a conviction without corroboration by other evidence 'as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.' The statute defines an accomplice as 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 945; accord, *People v. Johnsen* (2021) 10 Cal.5th 1116, 1155.) "'""[T]estimony" within the meaning of . . . [Penal Code] section 1111 includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators

used as substantive evidence of guilt which are made under suspect circumstances.'"' [Citation.] "'The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police.'"'" (*Hoyt*, at p. 946.)

"[E]vidence corroborating accomplice testimony "'need not independently establish the identity of the victim's assailant" [citation], nor corroborate every fact to which the accomplice testifies [citation], and "'may be circumstantial or slight and entitled to little consideration when standing alone.'"' [Citation.] But the evidence must nonetheless connect the defendant to the crime itself, rather than simply connect the accomplice to the crime." (*People v. Perez* (2018) 4 Cal.5th 421, 452; accord, *People v. Jasso* (2025) 17 Cal.5th 646, 685 [corroborating evidence "'need not be sufficient to establish every element of the charged offense'"; rather, "'[i]t is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth"'"].) "[A]n accomplice's testimony is not corroborated by the circumstance that the testimony is consistent with the victim's description of the crime or physical evidence from the crime scene. Such consistency and knowledge of the details of the crime simply proves the accomplice was at the crime scene, something the accomplice by definition *admits*. Rather, under section 1111, the corroboration must connect the defendant to the crime *independently* of the accomplice's testimony." (*People v. Romero and Self* (2015) 62 Cal.4th 1, 36; accord, *Perez*, at pp. 452-453.) "'The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration.'" (*Romero and Self*, at p. 32; accord, *People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128.)

Murphy and Smith contend they were improperly convicted based on Dale's testimony without sufficient corroborating evidence. Murphy argues the independent evidence was only sufficient to show he was a Hoover gang member. He maintains there was no evidence that identified him or Smith personally as the perpetrators other than Dale's statements. Smith asserts the only corroborating evidence was the cellphone location evidence, which was flawed because FBI special agent Easter could not confirm whether Smith's cellphone was in the area of the April 11 shooting.

Contrary to defendants' contentions, Dale's testimony was sufficiently corroborated by independent evidence that connected Murphy to the April 3 shooting and Murphy and Smith to the April 11 shooting. Officer Fernandez and Terry testified the Hoovers and Main Street Crips were rival gangs. Murphy testified he was a Hoover gang member, and Smith told the *Perkins* agent that he was from "West Side Hoover." The April shootings took place in Main Street Crip territory and occurred after the March 29 shooting of Smith. Murphy's and Smith's gang membership and motive for the April shootings (to retaliate against the Main Street Crips for the March 29 shooting) corroborated Dale's testimony. (*People v. Szeto* (1981) 29 Cal.3d 20, 28 [defendant's motive to assist his gang in gaining revenge upon two rival gangs for earlier slaying of fellow gang member corroborated accomplice's testimony]; *People v. Samaniego, supra*, 172 Cal.App.4th at p. 1178 [gang membership and motive corroborated accomplice's testimony]; *People v. Vu* (2006) 143 Cal.App.4th 1009, 1022 [accomplice testimony was corroborated by defendant's gang membership and motive to retaliate against rival gang for killing of fellow gang member].)

Further, Murphy was connected to the April shootings through the Ford Fusion, which was at the scene of both crimes. Surveillance video showed that prior to the April 3 shooting, the Ford Fusion passed Outten's car and entered a nearby alley from which the shooter emerged and shot at Outten and Stewart. The shooter then ran back into the alley, and the Ford Fusion quickly exited the alley. With respect to the April 11 shooting, surveillance video showed the Ford Fusion and a second car in the liquor store area just prior to the shooting. In addition, the surveillance video reflected that the shooting occurred at 6:23 p.m, just a minute after Murphy's cellphone was active in the area just south of the crime scene. Police officers stopped Murphy in the Ford Fusion on five occasions before and after the April shootings.

Moreover, Smith's statements to the *Perkins* agent corroborated Dale's testimony with respect to the April 11 shooting. Smith told the *Perkins* agent that the police caught Murphy's car on camera, the camera video only showed "the back and side," but "that shit happened in front of the store," and he and Murphy carried a "nine" millimeter firearm. A criminalist testified that two bullets recovered from the April 11 crime scene could have been fired from a nine-millimeter Luger. Smith's statements connected him to the April 11 shooting and provided sufficient independent corroborating evidence. (See *People v. Garton* (2018) 4 Cal.5th 485, 520 [defendant's statements in emails and recorded call provided independent corroboration of accomplice testimony]; *People v. Whalen* (2013) 56 Cal.4th 1, 56 [defendant's statement to detective "alone was sufficient independent corroboration tying defendant to the crimes"].)

In addition, the cellphone location evidence showed that on April 3, 2019 Murphy's cellphone was initially in Hoover territory, then 10 minutes later the cellphone was at the crime scene in Main Street Crip territory, and seven minutes after that the cellphone was again in Hoover territory. With respect to the April 11 shooting, both Murphy's and Smith's cellphones were in Hoover territory prior to the shooting and six minutes after the shooting. Further, Murphy's cellphone was active near the crime scene during the shooting. We recognize that, as Smith points out, Smith's cellphone did not have any activity at the time of the April 11 shooting. Further, FBI Agent Easter acknowledged that the cell towers have a sector coverage of "around 0.2 to 0.5 miles"; thus, Smith's cellphone was either within half a mile of the liquor store or it stayed in Hoover territory at the time of the April 11 shooting. Nonetheless, the cellphone evidence combined with the evidence tying Murphy to the Ford Fusion and Smith's *Perkins* statements were sufficient to corroborate Dale's testimony. (*People v. Perez, supra*, 4 Cal.5th at p. 452 [evidence corroborating accomplice testimony "'"may be circumstantial or slight and entitled to little consideration when standing alone"'"]; *People v. Romero and Self, supra*, 62 Cal.4th at p. 32 [same].)

F.      *Substantial Evidence Supports Murphy's and Smith's Convictions*

"In considering a sufficiency of the evidence claim, we review 'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Collins*

(2025) 17 Cal.5th 293, 307; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 142 ["'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.'"].)

"'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' [Citations.] 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; accord, *People v. Flores* (2020) 9 Cal.5th 371, 411 [appellate court must "'accept logical inferences that the jury might have drawn from the circumstantial evidence'"].) "We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal. 5th 285, 302; accord, *People v. Reed* (2018) 4 Cal.5th 989, 1006.)

Murphy and Smith contend there was not substantial evidence to support their convictions for murder, attempted murder, or conspiracy to commit murder. Murphy argues the evidence did not tie him personally to the April 3 and 11 shootings. Similarly, Smith contends no surveillance video or witness placed him at the scene of the April 11 shooting, and there was no DNA evidence linking him to the Ford Fusion, the gun, or the bullets. There is substantial evidence.

45

Dale testified that on April 3, 2019 Murphy was the driver and another Hoover gang member (Shady Tre) was the shooter. Surveillance video placed Murphy's Ford Fusion at the scene of the crime. In addition, the cellphone location evidence showed Murphy's cellphone was initially in Hoover territory, then at the crime scene around the time of the shooting (6:22 p.m.), then back in Hoover territory.

With respect to the April 11, 2019 shooting, Dale testified Murphy was the driver and Smith was the shooter. Smith admitted to the *Perkins* agent that the incident happened in front of the liquor store and that he carried a nine-millimeter firearm, which is consistent with evidence that the two recovered bullets could have been fired from a nine-millimeter Luger. In addition, surveillance video placed Murphy's Ford Fusion at the scene of the shooting at 6:23 p.m. In addition, both Murphy's and Smith's cellphones were in Hoover territory prior to the shooting and six minutes after the shooting, with Murphy's cellphone being active near the crime scene around the time of the shooting (6:23 p.m.). Moreover, as discussed, the testimony supported a theory that Murphy and Smith, as Hoover gang members, went to rival Main Street Crips territory to retaliate for the shooting of Smith on March 29. Dale's testimony, the independent corroborating evidence, and the gang evidence showing motive provide substantial evidence to support Murphy's and Smith's convictions.

## DISPOSITION

The judgment is affirmed.

FEUER, J.

We concur:

MARTINEZ, P. J.

STONE, J.